UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 19-CV-00075 NEB-JFD

CRAIG L. BREWSTER, JEAN M.
BREWSTER,

                    Plaintiffs,

     v.

UNITED STATES OF AMERICA,

                  Defendant.

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

This Federal Tort Claims Act medical malpractice action arises out of Plaintiff Craig Brewster's care at the VA Medical Center in Minneapolis in April 2014. After undergoing successful open-heart surgery, Mr. Brewster suffered a stroke, which is a known and disclosed risk of the procedure. Mr. Brewster alleges in this lawsuit that he suffered the stroke as the result of substandard care provided by the VA. His wife, Plaintiff Jean Brewster, also brings a derivative claim based upon the same allegations.

This lawsuit should be dismissed in its entirety, and summary judgment granted, because Plaintiffs' proffered experts in this matter do not sufficiently opine on the connection between the alleged negligence and Mr. Brewster's stroke. This deficiency is fatal to Plaintiffs' action under Minnesota medical malpractice law, and the Court need go no further in its analysis.

But even if the Court were to find that Plaintiffs' experts did clear Minnesota's strict requirements as to causation, it should still grant summary judgment or dismissal on large portions of Plaintiffs' claim.

First, although a portion of Plaintiffs' claim alleges that Mr. Brewster's attending surgeon and physician, Dr. Herbert Ward, was negligent, he was an employee of the University of Minnesota Physicians rather than the VA. Under the FTCA, the United States can only be liable for the negligence of its own employees, not contractors such as Dr. Ward. As a result, any claims of negligence against Dr. Ward fail under the FTCA and should be dismissed for lack of subject matter jurisdiction.

Plaintiffs also base part of their claim on a theory that a VA radiologist misread a chest x-ray prior to Mr. Brewster's stroke. Plaintiffs have not put forth a radiologist to testify to the alleged negligence by the VA's radiologist; instead, they rely exclusively on the testimony of a cardiothoracic surgeon. Such testimony is insufficient under Minnesota's statute regarding affidavits of expert identification, and warrants mandatory dismissal of this portion of the claim.

Finally, Plaintiffs' Amended Complaint appears to allege direct claims against the VA facility for its policies, procedures, and supervision of its medical personnel. However such claims are labeled, under Minnesota law, they must be supported by expert testimony. Plaintiffs have adduced no such testimony regarding facility-wide policies or procedures, and this portion of the claim likewise requires mandatory dismissal.

For these reasons, Defendant requests that this Court grant its motion to dismiss and for summary judgment, and dismiss this matter in its entirety.

## BACKGROUND

### I.      Mr. Brewster's Care at the VA Medical Center

On April 13, 2014, Plaintiff Craig Brewster ("Mr. Brewster") presented to the Emergency Department at the VA Medical Center ("VAMC") in Minneapolis, Minnesota. Declaration of Adam J. Hoskins ("Hoskins Decl."), Ex. A, at USA-00004204.   Mr. Brewster, 65, presented with left chest pain and a blood pressure reading of 213/105.   *Id.* at USA-00004204.   He reported that he had intermittent chest pain and pressure, and had generally felt "unwell" for the previous five days.   *Id.* at USA-00004202, USA-00004205. Mr. Brewster also indicated that he had a history of hypertension, but had not taken his blood pressure medication for a few years.   *Id.* at USA-00004205.

Labs were ordered in the VAMC Emergency Department, and showed an abnormally high troponin level.   *Id.* at USA-00004201.   Mr. Brewster was admitted to inpatient care later on the morning of April 13.   *Id.* at USA-00004199.   His Cardiology Admission Note documents likely past diagnoses of hyperlipidemia and hypertension, and notes that Mr. Brewster (1) had stopped taking his Lipitor prescription for hyperlipidemia because "he doesn't like meds," and (2) had stopped taking lisinopril for hypertension "because he didn't want to be on meds." *Id.* at USA-00004195, USA-00004197, USA-00004171.   The Admission Note indicated that the rising troponin levels were consistent with a non-ST-elevation myocardial infarction ("NSTEMI"), a type of heart attack. *Id.* at USA-00004197.   Mr. Brewster also received a new diagnosis of Type II diabetes during the intake process.   *Id.* at USA-00004168.

On April 14, Mr. Brewster underwent a cardiac catheterization and coronary angiogram, where he was found to have elevated left ventricular end-diastolic pressure ("LVEDP") and extensive three-vessel coronary artery disease ("CAD"). *Id.* at USA-00004168, USA-00004176. Based on those findings, the cardiology service determined that a coronary artery bypass grafting ("CABG") surgery was the best treatment option and sought a surgical consult. *Id.* at USA-00004176. Later that same day, Cardiovascular Surgery Nurse Coordinator Gina Donahue met with the Brewsters to give them information on the CABG surgery procedure. *Id.* at USA-00004163. Donahue noted that Mr. Brewster was "anxious to have the surgery ASAP," and that she planned to discuss the case with the cardiovascular surgeons the next morning. *Id.* at USA-00004163.

On April 15, Donahue discussed Mr. Brewster's case with Dr. Gabriel Loor in Cardiothoracic Surgery, who viewed the images from Mr. Brewster's cardiac catheterization and echocardiogram. *Id.* at USA-00004163. According to Donahue's notes, based on this review, Dr. Loor accepted Mr. Brewster for CABG surgery, and Mr. Brewster was scheduled for surgery on April 18. *Id.* at USA-00004163. The Cardiology Service notes indicate that the cardiology providers were "trying to get his case moved up" from this scheduled date "due to ongoing chest pain and severity of disease." *Id.* at USA-00004139. There was eventually a cancellation in the surgery schedule, and Mr. Brewster's procedure was moved from April 18 to April 17. *Id.* at USA-00004134.

On April 16, Cardiothoracic Fellow Dr. Amy Kirchner obtained informed consent from Mr. Brewster for the CABG procedure. *Id.* at USA-00004131-4132. The Informed Consent form identified the practitioner obtaining consent as "Kirchner, Amy E

(FELLOW)" and the supervising practitioner as "Ward, Herbert (PHYSICIAN)."  Hoskins

Decl. Ex. B, at USA-00005161.  The informed consent included a section on known risks

and side effects of the procedure, which stated that the known risks included, among others,

embolism, heart rhythm disturbances, partial or total lung collapse, stroke, heart attack,

organ failure, and death.  *Id.* at USA-00005163.  The informed consent also included a

section on alternatives to the procedure.  *Id.*  Both Dr. Kirchner and Mr. Brewster signed

the informed consent form the morning of April 16.  *Id.* at USA-00005166.  In signing, Mr.

Brewster attested that:

- Someone has explained this treatment/procedure and what it is for.
- Someone has explained how this treatment/procedure could help me, and things that could go wrong
- Someone has told me about other treatments or procedures that might be done instead, and what would happen if I have no treatment/procedure.
- Someone has answered all my questions.
- I know that I may refuse or change my mind about having this treatment/procedure. If I do refuse or change my mind, I will not lose my health care or any other VA benefits.
- I have been offered the opportunity to read the consent form.
- I choose to have this treatment/procedure.

*Id.*

On the evening of April 16, a Cardiology progress note indicates that Mr. Brewster

would "[t]ransfer to [cardiovascular] surgery tomorrow for CABG; dispo[sition] post-op

will be determined by them."  Hoskins Decl. Ex. A, at USA-00004126-4127.

On April 17—the morning of the CABG surgery—Mr. Brewster twice denied

having any questions or concerns regarding surgery, at 3:26 am, and 6:30 a.m. *Id.* at USA-

00004120-4121.  At 7:09 a.m., Dr. Ward entered a "Thoracic Surgery Attending Note" into

Mr. Brewster's medical chart.  *Id.* at USA-00004117.  In the note, Dr. Ward wrote that he had seen and examined the patient, that he concurred with the History & Physical in the chart, and that there had been no interval change in the History & Physical.  *Id.*  Dr. Ward also noted that he had reviewed the risks, benefits and alternatives to the procedure with Mr. Brewster.  *Id.*  According to this note, such risks of the CABG procedure include, among others, arrhythmia, prolonged hospitalization, heart attack, stroke, prolonged ventilation on a breathing machine, possible bronchoscopy, blood clots, pneumonia, disability, cardiac arrest, and death.  *Id.*  Dr. Ward noted that Mr. Brewster's chance of dying with this operation was approximately 3%.  *Id.*  Dr. Ward also documented that Mr. Brewster understood the risks and wished to proceed.  *Id.*

Mr. Brewster underwent the CABG procedure on the morning of April 17, 2014. *Id.* at USA-00004113.  Dr. Ward is listed as the staff surgeon for the procedure.  *Id.*  The Surgical Operation Report was dictated by Dr. Kirchner, and signed by Dr. Ward, and Dr. Ward is listed as the attending physician.  Hoskins Decl. Ex. C, at USA-00004210-4212. As part of the procedure, the surgery team placed four chest tubes in Mr. Brewster to assist the draining of fluid and air.  *Id.* at USA-00004210.  The report notes that "[t]here was no evidence of lung injury and there was no evidence of chest tube air leaks at the conclusion of the case." *Id.*  At the conclusion of surgery, Mr. Brewster remained intubated and was transferred to the Surgical Intensive Care Unit ("SICU") at approximately 3:00 p.m. on April 17. Hoskins Decl. Ex. A, at USA-00004113.

At 9:00 p.m. on April 17, Mr. Brewster was extubated, and is noted to have tolerated the procedure well.  *Id.* at USA-00004106.  Prior to extubation, a respiratory therapist

assessed Mr. Brewster for a spontaneous breathing trial, which was successful. *Id.* After passing the spontaneous breathing trial, Mr. Brewster was extubated according to the protocol for open-heart patients. *Id.* According to a progress note from a SICU nurse at 11:37 p.m. on April 17, there was no air leak present from Mr. Brewster's chest tubes. *Id.* at USA-00004108.

On April 18—the morning after Mr. Brewster's procedure—Cardiothoracic Surgery Physician Assistant Bonnie White Marsh entered a progress note at 9:23 a.m. *Id.* at USA-00004103.[1]  The note states that Mr. Brewster's care was discussed with the attending physician, Dr. Ward, and with the fellow who assisted the surgery, Dr. Kirchner. *Id.* at USA-00004105.  Marsh wrote that Mr. Brewster was requiring bilevel positive airway pressure ("BiPap") that morning as a breathing treatment, but was hemodynamically stable, had oxygen saturation between 95 and 100%, and was maintaining his oxygen saturation without the assistance of BiPap. *Id.* at USA-00004103, USA-00004105.  Marsh recorded the cardiothoracic surgery team's plan to remove three of the four chest tubes, and leave the left pleural chest tube in place. *Id.* USA-00004105.  Marsh also notes a plan to transfer Mr. Brewster to the 2L Unit, a stepdown unit in the VAMC. *Id.*

At 1:19 p.m. on April 18, Mr. Brewster was transferred to the 2L Unit. *Id.* at USA-00004099.  The intake note from 2L states that Mr. Brewster was receiving oxygen through a nasal cannula, and had oxygen saturation of 90%. *Id.* at USA-00004098.  At the time of

---

[1] In her deposition, Dr. Kirchner testified that the cardiothoracic team rounded together in the mornings, and that charting and documentation was routinely done by the physician extenders—nurse practitioners and physician's assistants—rather than the physicians themselves.  Deposition of Amy Kirchner, Hoskins Decl. Ex. D, at 27:7-15, 102:9-11.

intake, registered nurse Angela Diedrich noted that Mr. Brewster had one chest tube still in place. *Id.*

On the morning of April 19, registered nurse Cortney Martell noted that there was no air leak present from Mr. Brewster's chest tube. *Id.* at USA-00004092. Cardiothoracic fellow Dr. Garry Weide noted later that morning, at 10:29 a.m., that Mr. Brewster had been seen and examined, and that the plan was to discontinue the final chest tube that day. *Id.* at USA-00004089. Mr. Brewster had his chest tube removed that morning by the cardiothoracic team, and underwent a post-tube removal chest x-ray at 2:56 p.m. that day. *Id.* at USA-00004086. The 2:56 p.m. radiology report, authored by radiologist Dr. Virginia Griswold, notes that "[t]he left chest tube has been removed. There is no left apical pneumothorax. On the frontal viw [sic] there is a linear density extending from the aortic arch to the pulmonary artery in the region of the aortic pulmonary window. This could possibly represent a pleural reflection medially and a possible very small loculated pneumothorax." Hoskins Decl. Ex. E, at USA00000719-720.

At 3:53 p.m. on April 19, Diedrich entered Mr. Brewster's room and found him appearing in discomfort, slightly short of breath, and requesting pain medication. Hoskins Decl. Ex. A, at USA-00004081. Diedrich administered pain medication at 3:53 p.m. and 4:00 p.m., and subsequently called respiratory therapy, as Mr. Brewster became increasingly short of breath and anxious. *Id.* Diedrich administered an albuterol nebulizer at 4:15 p.m., with no relief. *Id.* At 4:21 p.m., Diedrich called the rapid response team. *Id.* Mr. Brewster was conscious and responsive, but felt like he was hyperventilating. *Id.* Although Mr. Brewster never lost a pulse, a "code" was called at 4:30, and Mr. Brewster

was intubated. *Id.* at USA-00004077, USA-00004081.  He was transferred back to the SICU by 4:42 p.m.  *Id.*

A progress note from 6:20 p.m. on the evening of April 19 states that a cardiovascular fellow was present upon Mr. Brewster's arrival at the SICU.  *Id.* at USA-00004080.  Upon Mr. Brewster's transfer to the SICU, another chest x-ray was obtained, which showed moderate subcutaneous emphysema that was new, as compared to the 2:56 p.m. post-chest tube removal x-ray.  *Id.* at USA-00004076.  As a result, a left chest tube was placed emergently, as well as a right femoral arterial line and a left subclavian central line.  *Id.*

Upon his arrival to the SICU, Mr. Brewster had developed atrial fibrillation with rapid ventricular response.  *Id.*  Dr. Daniel Stephens, a surgical resident, noted that cardioversion was attempted three times without a sustained response, but that amiodarone was then given and Mr. Brewster's heart rate improved to 120.  *Id.*  Dr. Stephens noted that Dr. Weide, a cardiothoracic fellow, was notified after Mr. Brewster was intubated and was promptly available at the bedside.  *Id.*  A bronchoscopy was performed to check for airway injury from Mr. Brewster's intubation, but no injury was found.  *Id.*  Mr. Brewster was again briefly hypotensive with atrial fibrillation and rapid ventricular response and a heart rate in the 180s, but improved after being given epinephrine and another medication, and as of 7:50 p.m. on April 19, was weaning off of the medication.  *Id.*  A progress note from nurse Sharon Marcotte at 9:02 p.m. on April 19 notes that Mrs. Brewster was present at the hospital and was updated on Mr. Brewster's condition by Dr. Weide.  *Id.*

A nursing progress note from the morning of April 20, 2014, noted that Mr. Brewster's heart had converted to a normal sinus rhythm and a heart rate in the 60s-70, as of 8:45 p.m. the evening before. *Id.* at USA-00004070. Nurse Dana Johnson notes that the "MD [was] updated" on this development. *Id.* Nurse Sharon Marcotte's April 20, 2014, progress note states that she was on shift from 7:30 a.m. to 8:00 p.m. *Id.* at USA-00004066. Nurse Marcotte notes that Mr. Brewster was alert and responsive, and his vital signs had been stable. *Id.* Nurse Marcotte noted that Mr. Brewster had been in a sinus rhythm for her whole shift, but was still receiving amiodarone, which "will be addressed by the team in the am." *Id.* A note from a respiratory therapist on the evening of April 20, 2014, notes that Mr. Brewster underwent—and passed—a spontaneous breathing trial to assess his readiness for extubation. *Id.* at USA-00004067. Mr. Brewster was not extubated, however, because according to the progress note, "MD wasnts [sic] to see PaO2 above 80, since pt intubated yesterday due to low sao2/Respiratory Failure." *Id.* Nurse Marcotte confirmed those instructions, noting that Mr. Brewster's PaO2 was "just a little too low at 70." *Id.* at USA-00004066.

On April 21, Nurse James Erickson also entered a nursing progress note, which covered the shift from 7:30 p.m. on April 20, to 8:00 a.m. on April 21. *Id.* at USA-00004063. Mr. Brewster was extubated by respiratory therapist Hayes Gregory at 7:45 a.m. on the morning of April 21, and tolerated the procedure "well." *Id.* at USA-00004059.

Later that morning, Nurse Practitioner Barbara Slotsve entered a "Cardiothoracic Surgery Inpt APN/PA Note." *Id.* at USA-00004060. Slotsve noted that Mr. Brewster had been extubated that morning. *Id.* According to Slotsve's note that morning, the plan was

10

to keep Mr. Brewster in the SICU. *Id.* at USA-00004061. Slotsve writes at the end of her note that the foregoing was discussed with Dr. Herb Ward and Dr. Amy Kirchner. *Id.* at USA-00004061. Slotsve noted at 5:45 p.m., in an addendum to her morning note, that Mr. Brewster was having difficulty with heart rate control despite being on metroprolol and amiodarone, that she had discussed with Dr. Kirchner, and that the team would switch to IV diltiazem to target a heart rate less than or equal to 100. *Id.* at USA-00004061.

Shortly after recording that addendum, Nurse Practitioner Slotsve was called by Nurse Jennings to evaluate Mr. Brewster, at approximately 5:55 p.m. *Id.* at USA-00004054. According to Slotsve, Jennings had checked on Mr. Brewster at approximately 5:00 p.m., at which time he was conversant and moving all extremities without difficulty. *Id.* At 5:45 p.m., Jennings checked on Mr. Brewster again and found him to be non-verbal, but with stable vitals. *Id.* Mr. Brewster was not responding to commands, had no grasp on his right side, and his right arm was flaccid compared to the left. *Id.* A neurology consult was placed based on the presumed stroke, and Mr. Brewster was reintubated prior to receiving a CT scan of his head. *Id.* Slotsve writes in her note that the "CV Fellow" was contacted, and that the CV fellow and Neurology resident were updated when they arrived to the SICU. *Id.* Slotsve also notes that the "CV staff requested chest CT while down for Head CT." *Id.* Nurse Jennings, in her documentation of the incident, notes that a "new chest tube [was] inserted at bedside by fellow." *Id.* at USA-00004052. Slotsve notes that Mrs. Brewster was notified at 6:45 p.m. regarding Mr. Brewster's change in status and the presumed stroke. *Id.* at USA-00004054.

Subsequent MRI findings confirmed that Mr. Brewster suffered a stroke. *Id.* at USA-00003990. Mr. Brewster alleges that he now suffers from a low quality of life as a result of the stroke, including having right-sided weakness, aphasia, and chronic pain. Doc. No. 32, at ¶ 184.

## II.   Dr. Herbert Ward

Dr. Herbert Ward was the surgeon who performed the CABG surgery, as well as Mr. Brewster's attending physician for the course of his post-operative care. In their Amended Complaint, Plaintiffs recognize that "[t]he attending cardiothoracic surgeon— here, Dr. Ward—is ultimately responsible for the care of the patient—here, Craig—and would oversee their post-op care, including daily physical exams and treatment planning." Am. Compl., Doc. No. 32, at ¶ 176. As Plaintiffs also acknowledge in their Amended Complaint, Dr. Ward was an employee of the University of Minnesota Physicians ("UMP") rather than the VA. *See id.* at ¶ 54 ("Dr. Herbert Ward is a cardiothoracic surgeon employed by the University of Minnesota Physicians, which contracted for his services with Minneapolis VAMC.").

## III.   Contract Between UMP and VA

Indeed, UMP provided cardiothoracic surgery services to the VA Medical Center through a services contract. *See* Colby Decl. Ex. A. Under this contract, UMP supplied the services of its cardiovascular and thoracic surgeons—including Dr. Ward—to provide the VA Medical Center with 24/7 departmental coverage. Colby Decl. ¶ 9; *id.* Ex. A, at 11. UMP was responsible for all clinical care and related treatment for veterans admitted to the VA Medical Center's Cardiovascular and Thoracic Inpatient and Outpatient

Departments.  *Id.*  The contract between UMP and the VA Medical Center called for UMP's cardiovascular and thoracic surgeons to provide outpatient clinic, inpatient attending, consultative, operating room surgical services, and on-call coverage at the Minneapolis VA.  Colby Decl. ¶ 10; *id.* Ex. A, at 11.  The contract was a fixed price contract between the VA and UMP, and all payments were to be made directly to the contracting entity (UMP) rather than to the individual medical personnel.  Colby Decl. ¶ 17.

The contract in effect at the time of Mr. Brewster's treatment identified eight UMP physicians that would provide cardiovascular/thoracic surgery services for the Minneapolis VA, including Dr. Ward, and set forth a rate schedule for each physician.  Colby Decl. ¶ 11; *id.* Ex. A, at 34.  The contract also provided that UMP would appoint one of its surgeons as the Chief of Cardiovascular and Thoracic Surgery at the VA Medical Center, to manage the clinical and administrative responsibilities of the department.  Colby Decl. ¶ 12; *id.* Ex. A, at 12, 37.  In addition to the cardiovascular and thoracic surgeons provided by UMP to staff the department, the Minneapolis VA provided three full-time nurse practitioners (two cardiac and one thoracic) and 2.4 FTE Physician's Assistants in support of the Cardio-Thoracic Service.  Colby Decl. ¶ 13; *id.* Ex. A, at 13.

The contract between UMP and the VA explicitly provides that employees of UMP are not considered to be employees of the Department of Veterans Affairs.  Colby Decl. ¶ 14; *id.* Ex. A, at 17.  The contract also explicitly states that the Federal Tort Claims Act ("FTCA") does not cover UMP or its employees.  Colby Decl. ¶ 15; *id.* Ex. A, at 17.  The contract also requires UMP to furnish its own medical liability insurance and states that under no circumstances will the contractor be considered a Minneapolis VA employee or

covered by VA liability insurance.  Colby Decl. ¶ 16; *id.* Ex. A, at 17.  The contract states
that the government "retains no control over the medical professional aspects of services
rendered (e.g., professional judgments, diagnosis for specific medical treatment, etc.)."
Colby Decl. Ex. A, at 27.

## IV.    Procedural Posture

Plaintiffs filed a pro se FTCA complaint against the United States on January 10,
2019.  ECF No. 1.  After being referred to the Federal Bar Association's Pro Se Project,
ECF No. 5, Plaintiffs moved for leave to amend their Complaint on July 15, 2019.  ECF
No. 15.  That proposed amendment sought both to add factual and legal support for the
existing pro se Complaint, and sought to add Dr. Ward and the UMP as additional
defendants in this matter.  *See* ECF No. 18.  Defendant opposed the motion—as it related
to adding Dr. Ward and the UMP as defendants—on futility grounds, as more than 4 years
had elapsed since the medical care at issue, putting any suit against the proposed defendants
outside of Minnesota's statute of limitations for medical malpractice.  The Court agreed
with Defendant, denied the motion for leave to amend the additional defendants, and held
that the proposed claims against Dr. Ward and the UMP were untimely (and thus, the
proposed amendment futile).  *See* ECF No. 31, at 7.

## V.     Allegations of Negligence

After unsuccessfully trying to add Dr. Ward and the UMP as defendants in this case,
Plaintiffs proceeded with their claim against the United States.  Plaintiffs allege a variety
of theories of negligence in their Amended Complaint, and assert that medical personnel
deviated from standards of medical care in several ways.  Plaintiffs also arguably assert

"direct" claims against the VA Medical Center for (1) failing to protect Mr. Brewster from the alleged negligent medical care provided by its personnel, (2) failing "to screen, hire [sic], investigate, train, adequately staff, and supervise" medical personnel, and (3) failing to have adequate systems and procedures in place to ensure proper communication between medical personnel and to ensure appropriate patient care.  ECF No. 32, at ¶ 195.

On May 14, 2021, Plaintiffs served their affidavit of expert identification, as required by Minn. Stat. § 145.682.  *See* Hoskins Decl. Ex. F.  That affidavit identified two experts: Dr. Donald Thomas, a cardiothoracic surgeon, and Dr. Peter Schulman, an anesthesiologist and critical care specialist.  *Id.* at ¶ 5, 13.  The affidavit also referenced and attached Dr. Thomas' preliminary report from 2016, and described the 2016 report as:

> not[ing] a number of deviations from the standard of care, including but not limited to, a failure to perform a computerized tomography scan ("CT Scan") of Mr. Brewster's chest on April 19, 2014 or April 20, 2014; failure to use anticoagulants following Mr. Brewster's atrial fibrillation; failure to timely recognize and treat Mr. Brewster's atrial fibrillation and atrial flutter; lack of examination by a medical doctor of Mr. Brewster following his cardioversion until 40 hours after; and lack of documentation and Attending involvement during Mr. Brewster's stay in the Intensive Care Unit ("ICU").

*Id.* at ¶ 11.  *See* Hoskins Decl. Ex. G (2016 report).  In that 2016 report, Dr. Thomas summarized his findings and concluded "[t]he cumulative effects of these deviations created an unreasonable risk of stroke that was dramatically higher than the general risk of stroke after CAB."  Hoskins Decl. Ex. G, at 4.

The affidavit of expert identification states Dr. Schulman's expert opinion as follows:

> 34. Dr. Schulman **suspects** the extensive subcutaneous emphysema and pneumothoraces that developed were a consequence of an adverse

intraoperative event (e.g., Mr. Brewster's lung was more likely than not injured during his surgery) that created an ongoing air leak.

35. Upon removal of the last chest tube on April 19, postoperative day 2, a conduit was no longer present to evacuate the air, and the air continued to rapidly accumulate and cause the extensive subcutaneous emphysema and pneumothoraces that were subsequently seen on numerous chest x-rays, and then seen on the chest CT that was performed on April 21.

36. The respiratory distress and respiratory code that Mr. Brewster suffered on April 19 more likely than not resulted from the aforementioned ongoing air leak, and from the extensive subcutaneous emphysema and/or pneumothoraces that developed after Mr. Brewster's last chest drain was removed.

37. The air leak and consequent respiratory code that Mr. Brewster suffered on April 19 more likely than not **contributed to the development of or caused** Mr. Brewster to develop atrial fibrillation.

38. The atrial fibrillation Mr. Brewster suffered on April 19, as well as his extensive air leak, more likely than not **contributed to or caused** the stroke he suffered on April 21.

Hoskins Decl. Ex. G, at ¶¶ 34-38 (emphases added).

The affidavit of expert identification does not expressly mention any deviations from the standard of care related to radiology. Dr. Thomas' attached 2016 report, however, includes a statement that the VA radiologist saw a pneumothorax but failed to inform the treatment team: "Radiologist Griswold found a pneumothorax that is seen on the cxr from 14:56 on 4/19. The radiologist should have called to inform the team of the ptx and need for additional imaging but failed to do so. Knowing that there was a pneumothorax present, the RRT and code would have been handled very differently." Hoskins Decl. Ex. G at 3. Subsequent to the affidavit of expert identification, Dr. Thomas served his expert report in this case on August 24, 2021. The expert report includes, among other allegations, Dr. Thomas' novel opinion that a VA radiologist **misread** a chest x-ray taken of Mr. Brewster

on April 19, 2014, finding no pneumothorax when one was present.  Thomas writes in his

expert report:

> Mr. Brewster's chest tubes were removed in the late morning of Saturday,
> April 19. The chest x-ray, for reasons that are unclear, was ordered for 15:00.
> That afternoon, Radiologist Griswold read the portable chest x-ray at 14:56
> and did not conclusively find or not find a pneumothorax. Not only is his
> [sic] report substandard, but it was misread. There is a clearly visualized right
> sided pneumothorax on this chest x-ray. Radiologist Griswold's report notes
> some other concerns, but no actionable finding was provided to a responsible
> party (i.e., the surgical resident).

Hoskins Decl. Ex. H, at 7-8.

Dr. Thomas is a cardiothoracic surgeon, and is currently employed as a Medical

Director of Cardiothoracic Surgery.  Hoskins Decl. Ex. I, at 2.  After medical school, he

completed a general surgery residency, a cardiothoracic surgery fellowship, and a

cardiothoracic surgery residency.  *Id.* at 1.  He is board certified by the American Board of

Thoracic Surgery and has also been certified by the American Board of Surgery during his

career.  *Id.* at 1-2.  Dr. Thomas, however, has no postgraduate training as a radiologist,

Deposition of Dr. Donald Thomas, attached as Ex. J to Hoskins Decl, at 26:5-7, and has

never practiced as a radiologist, *id.* at 26:19-21.  When asked whether he was familiar with

the standard of medical care for radiologists in his deposition, Dr. Thomas replied, "I am-

- I am--I look at x-rays and I -- and I have -- I have discussions with radiologists about x-

rays and finding on x-rays as it relates to cardiothoracic surgical problems. The standards

of their radiology -- the standards of what they do for something else, I don't know that

about [sic] but as it relates to cardiac surgery and thoracic surgery, I am -- I am sitting in

rooms and looking at x-rays with radiologists frequently."  *Id.* at 41:7-19.

17

## ARGUMENT

Defendant moves, under Rule 12(b)(1) and Rule 56, to dismiss Plaintiffs' claims in their entirety.  Plaintiffs' proffered expert testimony does not meet the strict requirements of establishing causation under Minnesota law.  But even if the testimony could clear that high bar, this Court does not have subject matter jurisdiction under the FTCA for any claims of negligence against Dr. Ward.  Likewise, Plaintiffs have not adduced competent and qualified expert testimony under Minn. Stat. § 145.682 to support (1) their claim that a VA radiologist deviated from the standard of care or (2) any direct facility-wide claim against the VA Medical Center.

## I.    Standards of Review

### A.    Rule 12(b)(1)

"The existence of subject-matter jurisdiction is a question of law that this court reviews *de novo*."  *ABF Freight Sys. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011).  "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' or a 'factual attack'" on jurisdiction.  *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  "The method in which the district court resolves a Rule 12(b)(1) motion — that is, whether the district court treats the motion as a facial attack or a factual attack — obliges us to follow the same approach."  *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).

When the United States in an FTCA case moves to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence.  *See Johnson v. United States*, 534 F.3d 958, 964 (8th Cir.

2008); *see also Tri-State Hospital Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003) (holding burden is on a party asserting jurisdiction under the FTCA to demonstrate that the conduct giving rise to the action occurred within the scope of the government employee's employment).  If the United States challenges the factual basis for jurisdiction, as it did here, "the [district] court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant," but "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *see also Erby v. United States*, 424 F. Supp. 2d 180, 182-84 (D.D.C. 2006) (discussing the burden of proof on plaintiff to establish FTCA jurisdiction).  A district court thus has the discretion to dismiss an FTCA action for lack of subject matter jurisdiction on any one of three separate bases:  "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Johnson*, 534 F.3d at 962 (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

   **B.     Rule 56**

   Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a

genuine issue for trial. *See Anderson*, 477 U.S. at 250; *see also Hartnagel v. Norman*, 953 F.2d 394, 395-96 (8th Cir. 1992). "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256. If the opposing party fails to carry that burden or fails to establish an essential element of its case, summary judgment should be granted. *See Celotex*, 477 U.S. at 322.

## II.   This case should be dismissed in its entirety, as neither the affidavit of expert review nor the subsequent expert opinions provide the required expert testimony as to the causation of Mr. Brewster's injuries.

This Court should grant summary judgment to Defendant on the entirety of Plaintiffs' claims, as their affidavit of expert review does not sufficiently set forth the required expert opinions regarding causation.

Generally, under Minnesota law, to establish a prima facie case of medical malpractice, a plaintiff must establish (1) the appropriate standard of care as recognized by the medical community, (2) a departure from the standard of care, and (3) causation. *Plutshack v. Univ. of Minn.*, 316 N.W.2d 1, 5 (Minn. 1982). "[A] physician is not responsible for the consequences of an honest mistake or error of judgment in his diagnosis or treatment." *Silver v. Redleaf*, 194 N.W.2d 271, 272 (Minn. 1972). Consequently, the plaintiff must show it was more probable than not that the defendant was responsible for the plaintiff's injuries. *Id.* at 273. Expert testimony is generally required to establish each of these elements. *Mattke v. Deschamps*, 374 F.3d 667, 672 (8th Cir. 2004) (citing *Silver*, 194 N.W.2d at 272). Only in the rare case where the facts fall "within the practical commonsense or common experience of all people" is expert testimony is not required. *Todd v. Eitel Hosp.*, 237 N.W.2d 357, 361 (Minn. 1975).

With regard to the required expert testimony, Minnesota has further "established a heightened requirement in medical malpractice suits which mandates that a plaintiff set forth his prima facie case at an early stage of litigation." *Adolphson v. United States*, 545 F. Supp. 2d 925, 930 (D. Minn. 2008) (Rosenbaum, J.). "To satisfy this heightened standard, a medical malpractice plaintiff must submit two different types of expert affidavits" under Minn. Stat. § 145.682. *Id.* "The first, called an affidavit of expert review, must be served with the complaint." *Id.* (citing Minn. Stat. § 145.682, subds. 2 and 3). "The second affidavit is referred to as an affidavit of expert identification . . . , must be served within 180 days of the suit's commencement,[2] and must disclose the identity and opinions of plaintiff's experts." *Id.* (citing Minn. Stat. § 145.682, subds. 2 and 4). Specifically, the affidavit:

> must be signed by each expert listed in the affidavit and by the plaintiff's attorney and state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion. Answers to interrogatories that state the information required by this subdivision satisfy the requirements of this subdivision if they are signed by the plaintiff's attorney and by each expert listed in the answers to interrogatories and served upon the defendant within 180 days after commencement of discovery.

Minn. Stat. § 145.682, subd. 4(a). If these requirements are not met and the deficiencies not remedied, the causes of action which require proof by expert testimony result in mandatory dismissal with prejudice. *Id.* § 145.682, subd. 6(c). Minnesota courts have

---

[2] This 180-day requirement can be extended by agreement of the parties, and has been extended here. *See* Minn. Stat. § 145.682, subd. 4(b). Defendant is not arguing that Plaintiff's affidavit of expert identification was untimely.

"stressed that plaintiffs must adhere to strict compliance with the requirements of Minn. Stat. § 145.682." *Broehm v. Mayo Clinic Rochester*, 690 N.W.2d 721, 726 (Minn. 2005).

With regard to the causation element of a *prima facie* case for medical malpractice, a plaintiff must ultimately show that the defendant's departure from the standard of care was a "direct cause" of the plaintiff's injuries." *Fabio v. Bellomo*, 504 N.W.2d 758, 762 (Minn.1993). *See also McDonough v. Allina Health Sys.*, 685 N.W.2d 688, 697 (Minn. Ct. App. 2004) ("As to the third element, a plaintiff must present competent expert testimony showing that the defendant's action or inaction was a direct cause of the injury." (citing *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 428 (Minn. 2002)). In other words, for expert testimony to demonstrate the causation element, the proffered expert must ultimately testify that "it is more likely than not that the defendant's negligence caused the injury." *Shellum v. Fairview Health Servs.*, No. A18-1516, 2019 WL 2262246, at *2 (Minn. Ct. App. May 28, 2019).

As the Minnesota Court of Appeals has noted with regard to the specificity of causation testimony required by § 145.682,

> [S]tatements such as the following will not meet the statute's requirements by themselves:
>
> (1) "the departure from the standard of care was a direct cause of [plaintiff's] second degree burns," *Mercer v. Andersen*, 715 N.W.2d 114, 123 (Minn. [Ct.] App. 2006);
>
> (2) "there was a failure to diagnose and treat a subarachnoid hemorrhage which ultimately resulted in a complicated hospital course and death," *Stroud [v. Hennepin Cnty. Med. Ctr.]*, 556 N.W.2d [552,] 554 [(Minn. 1996)];
>
> (3) "[T]he departures from accepted levels of care, as above identified, were a direct cause of [plaintiff's] death," *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 429 (Minn. 2002).

*Hawkins v. Fontaine*, No. A07-1460, 2008 WL 4006749, at *4 (Minn. Ct. App. Sept. 2, 2008).

Here, both Dr. Thomas' and Dr. Schulman's statements in the affidavit of expert identification are comparable to these statements of causation that have previously been rejected as insufficient to satisfy § 145.682. The only statement of causation attributable to Dr. Thomas in the affidavit of expert identification is that "the cumulative effects of these deviations created an unreasonable risk of stroke that was dramatically higher than the general risk of stroke." Hoskins Decl. Ex. F, at ¶ 4. Dr. Schulman, on the other hand, hedges his testimony by stating that a "**<u>suspected</u>**" "air leak . . . more likely than not **<u>contributed to the development of or</u>** caused Mr. Brewster to develop atrial fibrillation," and that "[t]he atrial fibrillation Mr. Brewster suffered on April 19, as well as his extensive air leak, more likely than **<u>not contributed to or</u>** caused the stroke he suffered." *Id.* at ¶¶ 34, 37, 38 (emphasis added). Similar language has been found insufficient by courts analyzing § 145.682. *See Walberg v. Dep't of Veterans Affs.*, No. CIV. 01-62(PAM/RLE), 2002 WL 31060378, at *2 (D. Minn. Sept. 12, 2002) ("Dr. Cobau's affidavit states merely that 'the above referenced breaches in the standard of care for conjunctival melanoma more probably than not *contributed to* the demise of the deceased.' This sort of broad and conclusory statement is not sufficient to survive dismissal under Minnesota law." (emphasis added)). Notably, neither physician comes close to addressing or supporting the required element that any alleged malpractice was more than likely "the direct cause" of Mr. Brewster's stroke. *See Fabio v. Bellomo*, 504 N.W.2d at 762. As a result, Plaintiffs' affidavit of expert identification insufficiently sets forth the proposed testimony on

23

causation for any of Plaintiffs' claims of medical malpractice.  Under § 145.682, this deficiency results in mandatory dismissal.  *See* Minn. Stat. § 145.682, subd. 6.  For this reason, the Court need go no further in its analysis, and should dismiss this matter in its entirety.[3]

### III.   Even if this case is not dismissed in its entirety, the portion of Plaintiffs' claim alleging that Dr. Ward was negligent should be dismissed, as he was not a VA employee.

But even if this Court holds that the expert affidavit's statements regarding causation can pass the strict threshold set by Minn. Stat. § 145.682, a large portion of Plaintiffs' claim should be dismissed.  First, any portion of Plaintiffs' claim alleging that Dr. Ward was negligent should be dismissed for lack of subject matter jurisdiction under the FTCA, as he was not a government employee.

### A.    As a limited waiver of sovereign immunity, the FTCA is narrowly construed by courts.

An important backdrop to this matter is the bedrock principle that claims for money damages against the United States are barred by the doctrine of sovereign immunity, except where Congress has expressly consented to such claims.  *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  "In 1946, Congress passed the Federal Tort Claims Act (FTCA), a limited waiver of the United States's sovereign immunity, to permit persons injured by federal-employee tortfeasors to sue the United States for damages in federal district court."

---

[3] Because "a loss-of-consortium claim is a derivative claim, the right to recover from a defendant derives, through marriage, from an injured spouse's ability to recover from the same defendant."  *Ryan, Tr. for Ryan v. Lindquist*, No. A18-0522, 2019 WL 1320581, at *4 (Minn. Ct. App. Mar. 25, 2019) (citing *Huffer v. Kozitza*, 375 N.W.2d 480, 482 (Minn. 1985)).  As a result, Mrs. Brewster's claim is entirely derivative of Mr. Brewster's, and should also be dismissed.

*Mader v. United States*, 654 F.3d 794, 797 (8th Cir. 2011). Congress consented to suits against the United States for money damages for only certain causes of action sounding in tort and under only the terms and conditions specified by the FTCA. *United States v. Orleans*, 425 U.S. 807, 814 (1976).

> The FTCA states, in relevant part, that:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission *of any employee of the Government* while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (emphasis added). "The [FTCA] is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976). The FTCA's terms and conditions must be strictly construed so as not to broaden Congress's limited waiver of sovereign immunity. *Block v. North Dakota*, 461 U.S. 273, 287 (1983). "The burden of proving the existence of subject matter jurisdiction rests with the party invoking federal jurisdiction." *Magee v. United States*, 9 F.4th 675, 680 (8th Cir. 2021).

### B. The FTCA allows money damages against federal government employees, but not against independent contractors.

Crucially, the FTCA only operates as a waiver of sovereign immunity as against federal *employees* who are acting within the scope of their employment. As defined in the FTCA, an "employee of the government" includes only (1) "officers or employees of any federal agency, members of the military or naval forces of the United States, members of

25

the National Guard while engaged in training or duty ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation," and (2) "any officer or employee of a Federal public defender organization." 28 U.S.C. § 2671.  The FTCA specifically exempts independent contractors from liability.  *See id.*  (noting that "federal agency" within the FTCA "does not include any contractor with the United States").  In other words, "[c]ontractors are explicitly exempted from the definition of federal agency" for purposes of the FTCA."  *Rutten v. United States*, 299 F.3d 993, 995 (8th Cir. 2002) (citing 28 U.S.C. § 2671); *see also Knudsen v. United States*, 254 F.3d 747, 750 (8th Cir. 2001) ("[T]he United States is not responsible for the torts of government contractors.").  Further, "[b]ecause the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions [to the FTCA], including the independent contractor exception."  *Rutten v. United States*, 299 F.3d 993, 995 (8th Cir. 2002) (quoting *Orleans*, 425 U.S. at 814).  As a result, if Dr. Ward was a contractor (or the employee of a contractor) as opposed to a federal employee, any negligence claim against him is not cognizable under the FTCA.

Whether an individual is a federal employee or independent contractor under the FTCA is a question of federal law. *See Logue v. United States*, 412 U.S. 521, 527(1973). "To determine whether an individual is an employee or contractor, the court must evaluate the extent to which the government has the power to supervise the individual's day-to-day operations." *Knudsen*, 254 F.3d at 750 (citing *Orleans*, 425 U.S. at 814). "The crucial

question is the amount of control exercised by the government over the physical performance of the individual." *Id.* (citing *Logue*, 412 U.S. at 527-28).

### C.   As Plaintiffs acknowledge, Dr. Ward was a contractor and not a VA employee.

Here, Dr. Ward was not a federal employee, but rather was an employee of the University of Minnesota Physicians, who contracted with the VA to provide cardiothoracic surgery services.  Plaintiffs acknowledge as much in their pleadings throughout this case. In the Amended Complaint, Plaintiffs allege that "Dr. Herbert Ward is a cardiothoracic surgeon employed by the University of Minnesota Physicians, which contracted for his services with Minneapolis VAMC." ECF No. 34, at ¶ 52.  Plaintiffs had previously sought to amend their complaint to add negligence claims against Dr. Ward and the University of Minnesota Physicians.  According to Plaintiffs' Proposed Amended Complaint filed in conjunction with that motion, proposed defendant University of Minnesota Physicians "employed Defendant Dr. Herbert Ward and signed the contracts for service with the Minneapolis VAMC." ECF No. 18-2, at ¶ 9.

Indeed, Dr. Ward did not have an employment relationship with the VA or the federal government.  Instead, his employer UMP provided cardiothoracic surgery services to the VAMC through a services contract.  *See* Colby Decl. Ex. A.  Under this contract, UMP supplied the services of its cardiovascular and thoracic surgeons—including Dr. Ward—to provide the VAMC with 24/7 departmental coverage.  Colby Decl. ¶ 9; *id.* Ex. A, at 11.  UMP was responsible for all clinical care and related treatment for veterans admitted to the VAMC's Cardiovascular and Thoracic Inpatient and Outpatient Departments.  *Id.*  The contract between UMP and the VAMC called for UMP's

cardiovascular and thoracic surgeons to provide outpatient clinic, inpatient attending, consultative, operating room surgical services, and on-call coverage at the Minneapolis VA. Colby Decl. ¶ 10; *id.* Ex. A, at 11. The contract was a fixed price contract between the VA and UMP, and all payments were to be made directly to the contracting entity (UMP) rather than to the individual medical personnel. Colby Decl. ¶ 17.

The contract in effect at the time of Mr. Brewster's treatment identified eight UMP physicians that would provide cardiovascular/thoracic surgery services for the Minneapolis VA, including Dr. Ward, and set forth a rate schedule for each physician. Colby Decl. ¶ 11; *id.* Ex. A, at 34. The contract also provided that UMP would appoint one of its surgeons as the Chief of Cardiovascular and Thoracic Surgery at the VA Medical Center, to manage the clinical and administrative responsibilities of the department. Colby Decl. ¶ 12; *id.* Ex. A, at 12, 37. In addition to the cardiovascular and thoracic surgeons provided by the UMP to staff the department, the Minneapolis VA provided three full-time nurse practitioners (two cardiac and one thoracic) and 2.4 FTE Physician's Assistants in support of the Cardio-Thoracic Service. Colby Decl. ¶ 13; *id.* Ex. A, at 13.

The contract between UMP and the VA explicitly provides that employees of UMP are not considered employees of the Department of Veterans Affairs. Colby Decl. ¶ 14; *id.* Ex. A, at 17. The contract also explicitly states that the FTCA does not cover UMP or its employees. Colby Decl. ¶ 15; *id.* Ex. A, at 17. The contract also requires UMP to furnish its own medical liability insurance and states that under no circumstances will the contractor be considered a Minneapolis VA employee or covered by VA liability insurance. Colby Decl. ¶ 16; *id.* Ex. A, at 17. The contract states that the government "retains no

control over the medical professional aspects of services rendered (e.g., professional judgments, diagnosis for specific medical treatment, etc.)." Colby Decl. Ex. A, at 27.

As Plaintiffs have alleged—and as the realities of the relationship between the VA and UMP demonstrate—Dr. Ward was not an employee of the VA or the federal government for purposes of the FTCA. Indeed, in materially identical circumstances, the Eighth Circuit Court of Appeals has held that physicians are not considered government employees for purposes of the FTCA. Specifically, in *Bernie v. United States*, 712 F.2d 1271, 1273 (8th Cir. 1983), the Court of Appeals considered whether physicians who treated the plaintiff at an Indian Health Service Hospital should be considered federal employees for purposes of invoking FTCA liability. In deciding that the physicians were not federal employees, the court noted that (1) the physicians, like Dr. Ward, were employed by other academic and healthcare institutions, (2) the contract between the institution and the federal agency, like the one here, supplied physician consultation based on a fee schedule, (3) payments related to treatment of patients were made directly to the contractor, not the physician, (4) and the agency did not exercise control over or dictate the physicians' medical judgment in the treatment of their patients. *Id.* at 1273. Under these circumstances, the court held that it was "clear that [the doctors] were employees of independent contractors holding service contracts with the government and were not acting as federal employees." *Id. See also Peacock v. United States*, 597 F.3d 654, 65-60 (5th Cir. 2010) (concluding that a physician was a contractor at the VA in part because the contracting institution "would assume all liability for the acts or omissions of its physicians during the scope of their employment.").

The reasoning of *Bernie* applies with equal force here, and Plaintiffs have not met their burden to demonstrate that subject matter jurisdiction exists over their claims under the FTCA that Dr. Ward was negligent in his treatment of Mr. Brewster.  For this reason, the Court should grant Defendant's motion under Rule 12(b)(1).[4]

## IV.   Even if this claim is not dismissed in its entirety, Plaintiffs' allegations that a VA radiologist was negligent are not properly supported under Minn. Stat. § 145.682, compelling dismissal of those allegations.

Through Dr. Thomas' August 24, 2021, expert report, Plaintiffs allege for the first time that there was a deviation from the medical standard of care based on a VA radiologist misreading Mr. Brewster's chest x-ray on April 19, 2014.  Dr. Thomas, however, is a cardiothoracic surgeon rather than a radiologist.  Dr. Thomas has no post-medical school training in radiology, and has never practiced as a radiologist.  As a result, his opinion is insufficient to meet the requirements of Minn. Stat. § 145.682, which requires a qualified and competent expert opinion to support a medical malpractice claim.  Such a failure under the statute requires mandatory dismissal, and this Court should dismiss any claim that a VA radiologist deviated from the medical standard of care in their treatment of Mr. Brewster.

Minnesota's medical malpractice affidavit requirement calls for expert disclosures by witnesses who are reasonably expected to be qualified and competent to offer admissible expert opinions.  *See Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 427 (Minn. 2002).

---

[4] Despite these claims not being actionable under the FTCA as against the United States, there *was* an available remedy for Plaintiffs.  Plaintiffs could have pursued a medical malpractice lawsuit against Dr. Ward and/or the University of Minnesota Physicians, and indeed, belatedly attempted to do so.  *See* ECF Nos. 15, 17.

The Court must determine, as a matter of law, whether the proffered expert witness is competent to testify concerning the matter at issue. *See Cornfeldt v. Tongen*, 262 N.W.2d 684, 692 (Minn. 1977). In a medical malpractice suit, a competent medical expert must possess both sufficient scientific knowledge and practical or occupational experience in the subject matter upon which they opine. *Id.* If an expert lacks specific training and experience in the malpractice claim's subject matter, that expert's testimony is insufficient to meet the requirements of Minn. Stat. § 145.682. *See Teffeteller*, 645 N.W.2d at 427-28.

Here, rather than designate a radiologist to testify to the alleged deviations from the standard of care by the VA radiologist, Plaintiffs instead have put forth the testimony of Dr. Thomas, a cardiothoracic surgeon. While Dr. Thomas may be qualified as an expert as to cardiothoracic surgery, he is not qualified to testify as to the alleged malpractice of a radiologist. "Under Minnesota law, a physician who is to give an expert opinion about the quality of care given by a defendant doctor must 'make a substantial showing of qualification in the particular field of inquiry.'" *Mattke v. Deschamps*, 374 F.3d 667, 671 (8th Cir. 2004) (quoting *Swanson v. Chatterton*, 160 N.W.2d 662, 669 (Minn. 1968). "It is generally required that expert physician witnesses have an understanding of what would usually and customarily be done by a doctor in a situation similar to that confronted by the defendant physician." *Id.* (citing *Lundgren v. Eustermann*, 370 N.W.2d 877, 880 (Minn. 1985)). Put slightly differently, under Minnesota law and § 145.682, "[a] proffered expert must have training and practical or occupational experience 'within the specific area about which he is to testify.'" *Robinson v. Minnesota*, No. 17CV437-DSD-KMM, 2020 WL 6729384, at *5 (D. Minn. July 22, 2020), *report and recommendation adopted*, 2020 WL

6712216 (Nov. 16, 2020) (quoting *Anderson v. Florence*, 181 N.W. 2d 837, 878 (Minn. 1970)).

Here, Dr. Thomas lacks the required practical or occupational experience as a radiologist to be a competent expert for the radiology allegations. Generally, Minnesota courts will consider whether there is a match between the specialties of the expert witness and the physician who allegedly has committed malpractice. *See Marquardt v. Schaffhausen*, 941 N.W.2d 715, 721 (Minn. 2020) (noting that proffered expert "is an orthopedic surgeon—the same type of doctor as" the allegedly negligent physician). Indeed, courts analyzing § 145.682 have previously ruled that surgeons, such as Dr. Thomas, are not qualified to opine on the standard of care of radiologists. *See Robinson*, 2020 WL 6729384, at *5 ("Critically, Dr. Seybold is not qualified to opine on the standard of care required of any of the remaining defendants. Dr. Seybold is a board-certified orthopedic surgeon; presumably, he would be qualified to opine on the standard of care for an orthopedic surgeon. But Dr. Saini is a radiologist . . . ."). And while Dr. Thomas may read x-rays and radiographic images as part of his surgery practice, he does so in conjunction with a radiologist. *See* Thomas Dep. 41:7-19. Such experience is akin to the argument that was rejected by the Eighth Circuit Court of Appeals in *Mattke*. *See Mattke*, 374 F.3d at 671 ("Dr. Donald Burrows, the Mattkes' only expert witness, testified that he was not a pathologist, though he had contacts with pathologists and pathology laboratories in the course of his duties as a physician.").

As a result, Plaintiffs have not proffered a qualified physician to testify as to any malpractice in radiology, and the Court should grant summary judgment on Plaintiffs'

claim that a VA radiologist misread Mr. Brewster's x-ray. *See Teffeteller*, 645 N.W.2d at 427–28 (even a physician with impressive credentials is not qualified to render an expert opinion without specific training and experience in subject matter of malpractice claim)

## V.   Any direct claim against the VA Medical Center is foreclosed under Minn. Stat. § 145.682, as there is no expert testimony regarding the facility's alleged failures.

Charitably read, Plaintiffs' Amended Complaint asserts direct allegations against the VA Medical Center as a facility. Specifically, the Amended Complaint asserts that the VA Medical Center (1) failed to protect Mr. Brewster from the alleged negligent medical care provided by its personnel, (2) failed "to screen, hire [sic], investigate, train, adequately staff, and supervise" medical personnel, and (3) failed to have adequate systems and procedures in place to ensure proper communication between medical personnel and to ensure appropriate patient care. ECF No. 32, at ¶ 195. Each of these potential theories of liability, however, are mere re-formulations of Plaintiffs' medical malpractice claim, and likewise would require competent expert testimony under Minn. Stat. § 145.682. Because Plaintiffs have not adduced any such testimony, any claim based upon these theories is foreclosed and should be dismissed.

The requirements of expert affidavits set forth in Minn. Stat. § 145.682 apply more broadly than to claims expressly labeled as "medical malpractice" against individual providers. Instead, the statute applies to all actions "alleging *malpractice, error, mistake, or failure to cure*, whether based on contract or tort, *against a health care provider* which includes a cause of action as to which expert testimony is necessary to establish a prima facie case." Minn. Stat. § 145.682, subd. 2. Under the statute, "health care provider"

means both individual physicians, surgeons, dentists, and other health care professionals, *and* hospitals such as the VAMC. *Id.* § 145.682, subd. 1.

Under Minnesota law, it is the essence of the claim—rather than a plaintiff's framing or titling of the cause of action—that determines whether the requirements of § 145.682 apply. *See Way v. Foley Dental Off.*, No. C8-91-1506, 1992 WL 43301, at *2 (Minn. Ct. App. Mar. 10, 1992) ("[S]ection 145.682 applies to appellant's claim despite the fact he did not denominate his action as one for malpractice."). In other words, "the key to determining whether [an] action is akin to one for medical malpractice depends not on the language of the complaint in isolation, but rather on the real-world context of the claim." *Comstock v. Nippoldt*, No. CX-01-960, 2002 WL 109488, at *2 (Minn. Ct. App. Jan. 29, 2002). To that end, Minnesota law "examine[s] whether the complained-of conduct flowed from the therapeutic relationship and constituted an integral part of the treatment process." *Id.*

Under whatever theory or label Plaintiffs wish to denominate their claim, the crux of the claims is that Mr. Brewster suffered an injury as a result of alleged negligence while he was a patient at the VAMC. The complained-of injuries, then, arose exclusively in the context of a doctor-patient relationship and involved the provision of patient care, indicating that § 145.682 applies under Minnesota law. *See id.* ("In this case, the actions giving rise to Comstock's complaint arose exclusively within the context of a doctor-patient relationship. Dr. Nippoldt recommended a treatment plan, referred Comstock to an oral surgeon, and fitted her with dentures. All of these activities involved rendering patient care.").

Even in situations where the medical aspect of the claim is more attenuated than here, Minnesota courts have held that the requirements of § 145.682 apply.  For instance, in *Fridell v. Commonbond Communities, Inc.*, No. A07-0665, 2008 WL 434616 (Minn. Ct. App. Feb. 19, 2008), the court considered whether negligence claims against an assisted living facility required compliance with the expert affidavit statute.  In *Fridell*, the plaintiff trustee brought a wrongful death negligence claim for negligent supervision and a dangerous condition, after the decedent, a woman with dementia, died after being scalded by the shower in her unit.  *Id.* at *2.  The plaintiff in *Fridell* argued that it was not asserting a malpractice claim, but rather a negligence action based on premises liability.  The Court of Appeals disagreed, and held that Plaintiff was, in essence, pursuing a professional negligence claim against a health care facility covered by § 145.682.  *Id.*  In so concluding, the court held that, in order to prove its claim, the plaintiff would have to prove that a duty was breached with "reference to whatever standards exist for assisted living facilities, reference to Jane Fridell's medical condition and the necessary assessments and level of care for her condition."  *Id.* at *3.  As a result, the *Fridell* court concluded that the claim for dangerous condition and negligent supervision implicated the expert affidavit requirements of § 145.682.  *Id.*

Likewise, in *C.C. v. Fairview Health Services*, No. A09–2320, 2010 WL 300603 (Minn. Ct. App. Aug. 3, 2010), the Minnesota Court of Appeals held that an expert affidavit was required to support a plaintiff's claims against the defendant arising from an alleged sexual assault while she was in a behavioral-health unit.  The Court of Appeals rejected the plaintiff's argument that her case involved only the safety and security of patients instead

35

of actual medical treatment, holding that "decisions regarding patient admission, monitoring, supervision, and security *implicate medical judgment*." *Id.* at *2 (emphasis added). Under the *C.C.* decision, if administrative decisions "implicate medical and professional judgment," lawsuits regarding those decisions "come under the purview of medical malpractice and error as those terms are used in Minn. Stat. § 145.682." *Id.*

Here, the gravamen of Plaintiffs' claim undoubtedly implicates the medical and professional judgment of the VA Medical Center. The questions that would need to be resolved under Plaintiffs' claim—regarding the adequate staffing level for a hospital or department, how to train and supervise medical personnel, what systems to have in place for communication between medical personnel, and the like—are quintessential medical and professional judgment questions. As a result, and because at base, Plaintiffs are alleging errors in Mr. Brewster's medical treatment by the VA Medical Center—the requirements of § 145.682 apply.

Despite this requirement, the affidavit of expert identification in this case is bereft of *any* expert testimony regarding facility-wide decisions or policies. The affidavit instead focuses only on individual treatment decisions by individual medical providers. *See* Hoskins Decl. Ex. F. The affidavit does not describe how the VA Medical Center violated any duty to protect Mr. Brewster, or violated any duty with regard to screening, hiring, training, investigating, staffing, or supervising its personnel, or failed to have proper communication systems in place. *See id.* Given this failure, this Court should dismiss the portion of Plaintiffs' claim alleging direct claims against the VA Medical Center.

## **CONCLUSION**

For these reasons, the Court should grant Defendant's motion to dismiss and for summary judgment.

Dated:  February 18, 2022

CHARLES J. KOVATS, Jr.
Acting United States Attorney

*s/ Adam J. Hoskins*

BY:  ADAM J. HOSKINS
Assistant United States Attorney
Attorney ID Number 393157
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415
(612) 664-5600
adam.hoskins@usdoj.gov

Attorneys for Defendant